IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**GARY DIX,**                                    Case No. 5:16 CV 946

Plaintiff,

     v.                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                          MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Gary Dix ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI") and disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the jurisdiction of the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned reverses the Commissioner's decision and remands for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for SSI and DIB in October 2012 (Tr. 177, 183), alleging disability as of May 19, 2010 (Tr. 206). His claims were denied initially (Tr. 123, 132) and upon reconsideration (Tr. 140, 147). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on August 19, 2014. (Tr. 39-65). On October 7, 2014, the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 22-33). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed the instant action on April 21, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

Personal and Vocational Background

Plaintiff was born on August 18, 1964, and was 48 years old on the alleged date of disability. (Tr. 66). He has a high school education and prior work as a driver, housekeeper, motor operator, and sandblaster. (Tr. 207). At the time of the hearing, he lived with his sister and nephew. (Tr. 48-49).

Hearing Testimony

### Plaintiff's Testimony

Plaintiff testified he is right-handed (Tr. 48) and has two adult children (Tr. 49). His medications at that time included meloxicam, gabapentin, hydrocodone, and hydrochlorothiazide, all which caused drowsiness. *Id.* A year prior he was prescribed Celexa for depression, but only took it for "[m]aybe three months because it was just too much for [him]." (Tr. 50). Plaintiff testified depression affected his daily activity, resulting in irritability. (Tr. 55). When the ALJ asked him how he spent a typical day, he responded: "ESPN." *Id.* His sister cooked, cleaned the apartment, and washed laundry. (Tr. 55-56). Plaintiff stated he had trouble dressing himself because he was not able to "bend over to pick up anything." (Tr. 57). He also had assistance showering, but had no trouble getting in and out of the tub. *Id.* Plaintiff did not drive a car because he had difficulty sitting for an extended period of time (Tr. 57) and no longer had a valid driver's license (Tr. 48).

He testified he had pain in his lower back, front of his leg, thighs, calves, and foot. (Tr. 50). Plaintiff stated he underwent back surgery in 2009. (Tr. 53). The pain interfered with his

sleep, for which he reported using a CPAP machine. (Tr. 52). Plaintiff stated he could stand, but was unable to walk for long periods of time, estimating he could walk for five or ten minutes at a time. (Tr. 50-51). He also experienced pain when sitting in a chair and estimated he spent seven hours a day in a recliner. (Tr. 51). Plaintiff stated he had been using a doctor-prescribed cane for a year and a half due to weakness in his legs. (Tr. 51-52). He testified his left hand was "just real numb and dead to [him]." (Tr. 54). Plaintiff stated he lacked strength in his left hand "[o]ff and on" for two or three years. *Id.* He testified he stopped attending school in 2011 due to back pain, and last worked in 2010.[1] (Tr. 56).

### *VE's Testimony*

The VE presented a series of hypothetical scenarios to the VE. The first hypothetical scenario consisted of an individual of the same age, education, and work experience as Plaintiff with the following limitations: lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; cannot climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, and crawl; frequently handle and finger with the non-dominant left upper extremity; must avoid workplace hazards such as unprotected heights or exposure to dangerous, moving machinery; limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation; cannot direct the work of others or be responsible for the safety or welfare of others; cannot perform work that requires strict production quotas; cannot perform piece rate work or assembly line work; and limited to occasional interaction with others. (Tr. 59-60). The VE stated the individual would be able to perform jobs in the regional and national economy, such as cleaner/housekeeper, mail clerk, and marker. (Tr. 60-61).

---

1. Plaintiff was taking classes toward a degree in social work. (Tr. 56, 330).

In the second hypothetical scenario, the individual had the same limitations as in the first hypothetical, except that he was further restricted to lift, carry, push, and pull ten pounds occasionally and five pounds frequently; and stand and walk for two hours in an eight-hour workday. (Tr. 61-62). The VE stated there would be jobs available the individual could perform, such as addresser, document preparer, and touch-up screener (printed circuit board assembly). (Tr. 62).

In the third hypothetical, the ALJ added a limitation that the individual would be off-task 33% of the time. (Tr. 62-63). The VE stated there would not be any jobs the individual could perform. (Tr. 63).

The fourth hypothetical was also the same as the first expect that the individual would be absent from work more than four days a month. *Id.* The VE stated there would not be any jobs available the individual could perform. *Id.* The VE added that even if the individual would be absent from work two days on average per month, he would be precluded from work. (Tr. 63-64).

<u>ALJ Decision</u>

On October 7, 2014, the ALJ issued a written a decision in which he made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since May 19, 2010, the alleged onset date.

3. The claimant has the following severe impairments: lumbar degenerative disc disease, left carpal tunnel syndrome, obstructive sleep apnea, depression, and panic disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot climb ladders, ropes, or scaffolds, but can occasionally stoop, kneel, and crawl. He can frequently handle and finger with his non-dominant left upper extremity. Moreover, the claimant must avoid workplace hazards such as unprotected heights or dangerous moving machinery. He is limited to simple routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others. The claimant cannot perform work requiring strict production quotas, and cannot perform piecework or assembly line work. Finally, he is limited to only occasional interaction with others.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on August 18, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 19, 2010, through the date of this decision.

(Tr. 19- 38) (internal citations omitted).

<u>Relevant Medical Evidence</u>

***Physical Impairments***

*Prior to May 19, 2010, Alleged Onset Date of Disability*

On February 16, 2009, Plaintiff complained of left hip pain for approximately one week and lumbar pain three weeks after lifting something heavy at work. (Tr. 298). It was noted he was having trouble ambulating and bending over. *Id.* A physical examination revealed moderate tenderness to palpation over the lower back and left hip, a negative straight leg raise test, and no evidence of swelling, effusion, or contusion. (Tr. 299). A lumbar spine x-ray revealed degenerative changes of the lower lumbar spine. (Tr. 317). Plaintiff was diagnosed with a hip sprain and back pain of unknown etiology. (Tr. 299). He was given a Tordal injection, advised to perform back exercises at home, and prescribed muscle relaxants and anti-inflammatory pain medication. (Tr. 301-02).

Dr. Anthony J. Ventimiglia's impression of an April 1, 2009 MRI of Plaintiff's lumbar spine was as follows:

> L3[-]L4, L4[-] LS, and LS-Sl disc protrusions as described above more prominent at L4-LS where it measures up to 3.5 mm at the left lateral recess and up to 4 mm at the left lateral recess at LS-Sl with associated annular tear. Disc material appears to contact the left sided intracanalicular nerve roots in these regions. There is mild spinal canal stenosis at L4-L5 and mild neural foraminal narrowing at L4 LS and LS-Sl.

(Tr. 314).

On May 8, 2009, Plaintiff underwent surgery ("micro laminectomy with discectomy L4-5, L5-S1, left"). (Tr. 283, 338-39). He was diagnosed with a herniated nucleus pulposus, stenosis of the lumbar spine, and "status post microlaminectomy, discectomy, L4-L5, L5-S1 on the left." (Tr. 288). Also on this day, a chest x-ray showed "[q]uestion mild pulmonary edema." (Tr. 310).

Plaintiff had a physical therapy appointment on May 9, 2009. (Tr. 286). One of his goals was to improve ambulation and it was noted he required a wheeled walker. *Id.*

*After May 19, 2010, Alleged Onset Date of Disability*

X-rays of Plaintiff's lumbar spine taken on May 17, 2010, showed "mild degenerative spinal changes" with "mild narrowing of L4-L5 and L5-S1 disc spaces", but "[t]he remaining lumbar vertebral bodies, disk spaces, and bone density [were] otherwise unremarkable" and "[t]he vertebral alignment appear[ed] proper." (Tr. 308).

On May 29, 2010, Dr. William Taylor gave his impression of a lumbar spine MRI. (Tr. 304). He stated:

> [D]egenerative disc disease last two lumbar intervertebral disc bases as discussed above, post[-]surgery with some residual mild broad-based disc bulging/ protrusion at both levels with trace epidural fibrosis on the left hand side LS-Sl level and slightly greater amount in the left hand side at the L4-L5 level[.]

*Id.*

On June 22, 2010, Plaintiff saw orthopedic spine surgeon, Dr. Jeffrey S. Tharp, D.O., for a checkup and to have paper work completed. (Tr. 331). Dr. Tharp noted Plaintiff: "had a lumbar sprain/strain with substantial aggravation of his lumbar degenerative disc disease causing mechanical back pain secondary to his work injury with bulging disc causing minor radicular symptoms." (Tr. 332). A straight leg test was negative and Plaintiff demonstrated "[g]ood strength, stability and range of motion shoulders, elbows, wrists, hips, knees[,] and ankles without discomfort, instability[,] or pain." *Id.* Dr. Tharp recommended "conservative[]" treatment consisting of nonsteroidal anti-inflammatory medication and a back brace. *Id.*

In September 2010, Plaintiff had a consultation for rehabilitative care. (Tr. 355-57). Upon a physical examination, Steven A. Cremer, M.D., noted: "[Plaintiff] gets in and out of a chair

independently. He stands and ambulates independently. Gait is not antalgic. . . . He can heel and toe walk." (Tr. 356). A straight leg raise test was positive on the left and negative on the right. *Id.*

Plaintiff saw Dr. Cremer again on May 17, 2011. (Tr. 351). Dr. Cremer noted: Plaintiff had "volunteer work scheduled this summer"; he reported "some increased pain at the end of his work condition with increased hamstring pain[]"; and had "associated limited range of motion" in his back. *Id.* A straight leg raise test was positive on the left. *Id.* Dr. Cremer recommended a Medrol Dosepak and continued Plaintiff's prescription for Vicodin. *Id.* Plaintiff also had a positive left straight leg test in June 2011. (Tr. 350).

Plaintiff went to the emergency room on February 10, 2012, complaining of chest pain. (Tr. 388). A chest x-ray was normal and Plaintiff was diagnosed with atypical chest pain, hypertension, and tobacco abuse. *Id.* He was prescribed aspirin. (Tr. 391).

On July 17, 2012, Plaintiff went to the emergency room complaining of acute back pain. (Tr. 372-73). He had "moderate paraspinal tenderness in the lumbosacral region, but no midline tenderness." (Tr. 373). He also had a normal range of motion in all extremities, but positive straight leg raise testing bilaterally. *Id.* Plaintiff was prescribed pain medication and discharged with a final diagnosis of "[l]umbosacral pain, possible herniated disk." *Id.*

A few days later, on July 22, 2012, he returned to the emergency room complaining of worsening back pain. (Tr. 364). Plaintiff stated: "that prior to Saturday when the current symptoms started, he was riding his bike and stated that he might have been [a] little bit too . . . active and he [was] also doing pull-ups. He admits that he might have aggravated by doing these activities in addition to cutting grass." *Id.* A physical examination revealed a normal range of back motion, "with the exception of flexion[]" because "[Plaintiff] was not able to engage in

flexion." (Tr. 364-65). The record also states: "X-rays of the lumbosacral spine showed very mild degenerative spondylosis at L4-L5 disk, very mild dextroscoliosis, loss of usual lumbar lordosis, which may be the basis of patient positioning or muscle spasm." (Tr. 365, 370). Plaintiff was prescribed pain medication. *Id.*

At the end of July, on July 31, 2012, Plaintiff continued to complain of back pain. (Tr. 493). Mihaela Iovi, M.D. noted: his "[b]ack locked up on him, after cutting grass on Friday last week." *Id.* A physical examination revealed Plaintiff had an abnormal gait and lumbar spine range of motion. (Tr. 494). He had a negative straight leg raise (Tr. 494), and "no cauda equine symptoms." (Tr. 493).

An October 4, 2012, lumbar spine MRI revealed: 1) "L4-L5 left paracentral disk herniation with mass-effect on the left L5 nerve root and mild central canal stenosis"; and 2) "L5-S1 posterior with changes with enhancing epidural scar . . . . There is left greater than right neural foramina narrowing . . .". (Tr. 361-62). This MRI was later interpreted to show "some compression on left L5 nerve root . . ." (Tr. 475).

On December 7, 2012, Plaintiff went to the emergency room complaining of back and leg pain. (Tr. 462). The recommendation was to continue physical exercises and pain management. (Tr. 463). Surgery was not recommended and Plaintiff was "not interested in surgery at this point regardless of who the surgeon would be even if he did have surgical indication." *Id.*

A physical examination in April 2013, revealed an abnormal gait; lumbar spine tenderness and abnormal range of motion; but no thoracic spine tenderness and a normal range of motion. (Tr. 544). Plaintiff complained of weakness, numbness, and paresthesia; the physical examination showed an abnormal light touch sensation, but no muscle weakness and no decreased muscle tone. *Id.*

Plaintiff first saw Jeffrey D. Bachtel, M.D. on May 7, 2013. (Tr. 560). A physical examination of Plaintiff's back revealed tenderness over the sciatic notch, but no other abnormalities. (Tr. 560-61). Dr. Bachtel assessed him with a lumbar disc herniation and prescribed pain medication. (Tr. 561). Also in May 2013, Plaintiff underwent a sleep study, after which he was diagnosed with severe obstructive sleep apnea. (Tr. 547-48).

On July 8, 2013, Dr. Bachtel noted a physical examination of Plaintiff's back showed normal spinal curvature; normal strength and sensation; no parasponal tenderness or spasms; nontender [sacroiliac] joints; but tenderness over the sciatic notch. (Tr. 556). He assessed Plaintiff with lumbar disc herniation and lumbar degenerative disc disease. (Tr. 557). Also in July 2013, Plaintiff began treatment with a pain management specialist. (Tr. 564).

A nerve conduction study was administered in May 2014. (Tr. 613). Lawrence Saltis, M.D.'s impression was: "left median mononeuropathy at the wrist of a significant nature. Minimal variation from normal of the left radial nerve and left ulnar nerve is essentially insignificant." (Tr. 613). Plaintiff later underwent physical therapy for his left hand. (Tr. 656).

### Mental Impairments

On June 21, 2011, Plaintiff reported he felt depressed due to his "lack of function" and "had difficulty doing his volunteer job". (Tr. 350). However, he "continue[d] to job search". *Id.*

Plaintiff began counseling with an initial psychiatric evaluation on August 21, 2012. (Tr. 446). He was diagnosed with severe, recurrent major depressive disorder without psychotic features. (Tr. 433, 539). He was treated with regular counseling and medication. (Tr. 431-53, 519-40).

In a September 11, 2012, treatment note the physician noted Plaintiff was "still struggling" with an "inability to walk". (Tr. 440). Later that month, it was noted he was "improving" and sleeping "great". (Tr. 437-38).

Plaintiff stated he experienced panic attacks, racing thoughts, a rapid heartbeat, shallow breathing, and anxiety. (Tr. 433, 440). Plaintiff's stated his family members had been "commenting on [his] mood change". (Tr. 435). Plaintiff reported a decreased appetite, difficulty sleeping, avoidance of social interactions, and difficulty focusing. (Tr. 435, 444, 446). Plaintiff also reported passive suicidal thoughts. (Tr. 446). Mental status examinations showed he had "good" attention and concentration (Tr. 433, 435[2], 437, 440, 444, 520, 522, 524, 526, 528, 530[3], 532, 534, 536) ; "logical" associations (Tr. 433, 435, 437, 440, 444, 520, 522, 524, 526, 528, 530, 532, 534, 536) ; "critical" or "automatic" judgment (Tr. 433, 435, 437, 440, 444, 520, 522, 524, 526, 528, 530, 532, 534, 536) ; "true" insight (Tr. 433, 435, 437, 440, 444, 520, 522, 524, 526, 528, 530, 532, 534, 536) ; was oriented to time, person, situation, and place (Tr. 433, 437, 440, 444, 520, 522, 524, 526, 528, 532, 534, 536); "intact" recent and remote memory (Tr. 433, 435, 437, 440, 444, 520, 522, 524, 526, 528, 530, 532, 534, 536) ; and "good" fund of knowledge (Tr. 433, 435, 437, 440, 444, 520, 522, 524, 526, 528, 530, 532, 534, 536).

During the course of his counseling Plaintiff was assessed with Global Assessment of Functioning ("GAF") scores. (Tr. 433, 437, 444, 520). His GAF score ranged from 41-60.[4] *Id.*

2. The box association with "concentration" is checked for "poor", but there is a note that reads: "Good in interview". (Tr. 435).
3. The box association with "concentration" is checked for "poor", but there is a note that reads: "Good in interview". (Tr. 435).
4. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF

Opinion Evidence

### *State Agency Reviewers*

On December 3, 2012, state agency reviewer Leon D. Hughes, M.D., determined Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of four hours; sit for about six hours in an eight-hour workday; frequently climb ramps/stairs; occasionally stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. (Tr. 74, 86). On February 20, 2013, a second state agency reviewer, Elaine M. Lewis, M.D., confirmed these findings. (Tr. 100-02, 113-15).

On December 4, 2012, state agency reviewer Caroline Lewin, Ph.D., determined: (1) Plaintiff had mild limitations in restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace; and (2) no repeated episodes of decompensation. (Tr. 71-72, 83-84). She therefore determined Plaintiff did not meet the requirements for Listing 12.04 or 12.06. *Id.* On February 21, 2013, a second state agency reviewer, Aracelis Rivera, Psy.D., confirmed these findings. (Tr. 98-99, 111-12).

---

scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM–V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice"). Even though GAF scores were eliminated in the most recent addition, which was published in 2013, the Sixth Circuit has since explained that GAF scores still "may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016). Thus, as set forth in the DSM—IV A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *DSM-IV-TR* at 34. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)". *Id.* at 34.

*Dr. Bachtel's Opinion*

On July 8, 2013, Dr. Jeffrey D. Bachtel completed a "Residual Functional Capacity Questionnaire". (Tr. 553-54). He opined Plaintiff's impairments "constantly" interfered "with the attention [and] concentration required to perform simple work-related tasks". (Tr. 553). Another question asked Dr. Bachtel whether Plaintiff would "need to recline or lie down during a hypothetical [eight]-hour workday in excess of the typical [fifteen]-minute break in the morning, the 30-60 minute lunch, and the typical [fifteen]-minute break in the afternoon". (Tr. 553). He checked the box for "Yes". *Id.* He also noted Plaintiff would not be able to walk any number of city blocks "without rest or significant pain"; could sit for fifteen minutes at a time and for a total of one hour in an eight-hour workday; stand/walk for ten minutes at a time and zero hours in an eight-hour workday; would require "shifting positions at will from sitting, standing, or walking"; and would require unscheduled breaks every fifteen minutes during an eight-hour workday. *Id.* When asked how long each of these breaks would need to last, Dr. Bachtel responded: "Truthfully, he is not able to work." *Id.*

Dr. Bachtel determined Plaintiff could occasionally[5] lift ten pounds, but never twenty; could reach with his arms 75% and use his hands and fingers 100% of the time during an eight-hour workday; would be absent from work more than four times a month; and was not "physically capable of working an [eight-]hour day, [five] days a week employment on a sustained basis". (Tr. 554). When asked whether Plaintiff was a malingerer, Dr. Bachtel checked the box for "No". *Id.*

---

5. Occasionally is defined as "less than 1/3 of the 8-hour workday". (Tr. 554).

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff asserts the ALJ erred by: 1) violating the treating physician rule; and 2) finding Plaintiff did not meet or medically equal the criteria of Listing 1.04. (Doc. 13, at 9-16).

<u>Treating Physician Rule</u>

Plaintiff first argues the residual functional capacity ("RFC") finding failed to account for his limitations because the ALJ did not give deference to the opinion of treating physician, Dr. Bachtel. (Doc. 13, at 9-14). The Commissioner responds the ALJ properly evaluated the medical opinions and substantial evidence supports the RFC. (Doc. 15, at 9-12).

Plaintiff's argument implicates the well-known treating physician rule. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Rule ("SSR") 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship,

the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). The Sixth Circuit has held that an ALJ may also give "good reasons" by challenging the supportability and consistency of the treating physician's opinion in an "indirect but clear way", *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010), or "implicitly provid[ing] sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little to no weight overall", *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006). The Sixth Circuit has made clear that a court should "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion." *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (internal quotation and citation omitted).

When an ALJ determines a treating physician's opinion is not entitled to controlling weight, he must provide support to refute either the opinion's objective basis or its consistency with other record evidence. *Gayheart*, 710 F.3d at 376-77. Conclusory statements in this regard, however, are not sufficient. *See Rogers*, 486 F.3d at 245-46 (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain

why it is the treating physician's conclusion that gets the short end of the stick."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097, *7-8 (S.D. Ohio) (finding ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported); *see also Blackburn v. Colvin,* 2013 WL 3967282 at * 7 (N.D. Ohio) (an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected"); *Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D. Ohio) ("[A]lthough the ALJ made a general statement about inconsistencies between [the doctor's] opinions and the 'medical evidence of record,' it was just that—a general statement devoid of any specific reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.").

Here, the opinion at issue is Dr. Bachtel's July 8, 2013, "Residual Functional Capacity Questionnaire". (Tr. 553-54). He determined Plaintiff's impairments "constantly" interfered "with the attention [and] concentration required to perform simple work-related tasks"; he would need to recline or lie down during the workday in excess of typical breaks; he would not be able to walk any number of city blocks; he could sit for fifteen minutes at a time and for a total of one hour in an eight-hour workday; he could stand/walk for ten minutes at a time and zero hours in an eight-hour workday; he would require "shifting positions at will"; and he would require unscheduled breaks every fifteen minutes during an eight-hour workday. *Id.* When prompted to respond how long each of these breaks would need to last, Dr. Bachtel stated: "Truthfully, he is

not able to work." *Id.* Dr. Bachtel concluded Plaintiff could occasionally[6] lift ten pounds, but never twenty pounds; could reach with his arms 75% and use his hands and fingers 100% of the time during an eight-hour workday; would be absent from work more than four times a month; and was not "physically capable of working an [eight-]hour day, [five] days a week employment on a sustained basis". (Tr. 554).

In evaluating Dr. Bachtel's treatment records and opinion, the ALJ stated:

On May 7, 2013, the claimant established care with Jeffrey Bachtel, M.D. (16F/6). Dr. Bachtel noted the claimant's history of back pain and disc herniation, and prescribed Vicodin (16F/7). The claimant attended two more appointments with Dr. Bachtel, and received refills of his medication. Dr. Bachtel made no additional diagnoses, but on July 8, 2013, he completed a "disability form" and referred the claimant to pain management (16F/3). ***

***

On April 1, 2014, the claimant complained to Dr. Bachtel that he had numbness and tingling in his left hand, and stated that he does do push-up exercises four times per week (21F/9). ***

***

On July 8, 2012, Dr. Bachtel[] filled out a form designed to assess the claimant's physical limitations. He opined that the claimant could lift or carry 10 pounds, could stand or walk 0 hours in a[n] 8-hour workday, and could sit for 1 hour in a[n] 8-hour workday without having to change position. He further opined that the claimant would likely miss about 4 days of work per month due to his impairment, would require a break every 15 minutes, and states that he "is not able to work" (15F/2). Little weight is given to this opinion, because it is not in accordance with Dr. Bachtel's own record. At the time this form was completed, Dr. Bachtel had only treated the claimant on three occasions, and provided no care other than to prescribe pain relief medication. Thus, Dr. Bachtel's own record does not support [his] rather restrictive opinion. Moreover, Dr. Bachtel's opinion that claimant was unable to work is tantamount to a disability opinion, a matter reserved to the Commissioner for determination. Such an opinion by a treating physician is not entitled to "any special significance." 20 C.F.R. § 404.1527(e). See also Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th

---

6. Occasionally is defined as "less than 1/3 of the 8-hour workday". (Tr. 554).

Cir. 2004) (recognizing the determination of disability to be the prerogative of the Commissioner, not the treating physician).

(Tr. 28-31).

Plaintiff asserts the ALJ failed to provide "good reasons" for assigning this opinion "little weight". (Doc. 13, at 9). The undersigned does not agree.

First, the ALJ explained the opinion was given "little weight" because it was inconsistent with Dr. Bachtel's own treatment record. The ALJ explained Plaintiff had only seen Dr. Bachtel three times when he issued the opinion and his conservative treatment consisting only of pain medication was inconsistent with his "rather restrictive opinion". (Tr. 30). This reasoning speaks to the factors of length of treatment relationship, frequency of examination, the supportability of the opinion, and the consistency of the opinion. *See Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)); *see also* § 416.927(d)(2). Furthermore, it is supported by substantial evidence.

Plaintiff first saw Dr. Bachtel in May 2013 (Tr. 560) and saw him twice more prior to the issuance of the opinion (Tr. 555-62). Dr. Bachtel prescribed Vicodin and referred Plaintiff to pain management. *Id.* Dr. Bachtel's physical examinations reveal Plaintiff was well-developed, well-nourished, and in no acute distress. (Tr. 556, 558, 560). An examination of his back revealed "tender[ness] over [the] sciatic notch", but normal spinal curvature, normal neurological findings, no paraspinal spasms or tenderness, non-tender [sacroiliac] joints (Tr. 556, 558, 560), and no edema in the extremities (Tr. 558-59, 560-61). The ALJ also noted Plaintiff reported to Dr. Bachtel he performed push-up exercises four times a week, which is inconsistent with the severity of the opinion he issued. (Tr. 29) (citing Tr. 640).

Second, the ALJ properly noted that Dr. Bachtel's opinion Plaintiff was unable to work was not entitled to deference. The regulations reserve the ultimate decision regarding disability

to the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e); *see also* 20 C.F.R. § 404.1527(e)(3) (no "special significance" given to opinions about disability, even those by treating physician); *Brock*, 368 F. App'x at 625. Thus, the ALJ was justified in rejecting Dr. Bachtel's conclusion that Plaintiff was unable to work. (Tr. 30-31). Importantly, the final responsibility for determining a claimant's RFC "rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x. 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).

Although Plaintiff points to other evidence in the record to support his position, this Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The ALJ adequately provided "good reasons" for assigning "little weight" to Dr. Bachtel's opinion and his conclusion is supported by substantial evidence. The ALJ did not err in applying the treating physician rule and not adopting Dr. Bachtel's limitations in the RFC.

Listing 1.04

Plaintiff next argues the ALJ erred in his determination Plaintiff's impairments did not meet or medically equal Listing 1.04. (Doc. 13, at 14-16). The Commissioner responds substantial evidence supports the ALJ's finding Plaintiff's impairments did not meet or equal the Listing. (Doc. 15, at 5- 8).

The Listings streamline the disability decision-making process by identifying people whose impairments are more severe than the statutory disability standard such that their impairments would prevent them from performing *any* gainful activity—not just substantial gainful activity—regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); SSR 83-19, at 90). The Listings create a

presumption of disability making further inquiry unnecessary. *Id.* Each Listing establishes

medical criteria, and to qualify for benefits under a Listing, a claimant must prove his

impairment satisfies all the Listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also*

*Zebley*, 493 U.S. at 530.

It is Plaintiff's burden to establish he met or equaled a Listing. *See Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001). Listing 1.04 describes a kind of musculoskeletal impairment:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.
>
> 20 C.F.R. 404, Subpt. P., App. 1, § 1.04.

The ALJ specifically considered Listing 1.04 in his opinion. (Tr. 25). In finding none of

Plaintiff's impairments met or medically equaled a listed impairment, he stated:

> First, I considered listing 1.04, Disorders of the spine. In considering this listing, the undersigned looked to see whether the claimant's degenerative disc disease showed evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. Although the claimant has the severe impairment of degenerative disc disease, he nonetheless fails to meet listing 1.04, because the medical evidence does not include evidence of nerve root compression, spinal arachnoiditis or

lumbar spinal stenosis. Moreover, the claimant's back disorder has not resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b), since the claimant retains full range of motion of his lower extremities and is able to ambulate independently (5F/310).

*Id.*

Plaintiff asserts this conclusion is erroneous because, contrary to the ALJ's assertion, there is indeed evidence of nerve root compression in the record. (Doc. 13, at 14-15) (citing Tr. 288, 338, 475). Defendant counters Plaintiff does not meet his burden because while there is evidence of herniation in the record, which the ALJ acknowledged, there is no evidence of nerve root compression. (Doc. 15, at 5-7).

A review of the record reveals, contrary to the ALJ's conclusion, there is at least some indication of nerve root compression. An October 4, 2012 MRI of Plaintiff's lumbar spine revealed, among other things, a "probable mass-effect on the left L5 nerve root in the lateral recess there is mild central canal stenosis." (Tr. 361). A few months later, on January 4, 2013, Usual Aurora Liong, M.D., interpreted the MRI to show: "dis[c] protrusion at L4-L5 with *some compression on left L5 nerve root* [with] degeneration [and] protrusion at L-5-S1 level". (Tr. 475) (emphasis added). The ALJ did mention the MRI and noted it showed: "herniation at the L4-L5 level and L5-S1 narrowing and scarring" (Tr. 28), but did not mention the compression on the L5 nerve root.

The ALJ also found Plaintiff's impairment did not meet the requirements of (B)(2)(b) because his condition did not inhibit his ability to ambulate effectively. (Tr. 25). This reason speaks to Listing 1.04(C). Plaintiff asserts he also meets the requirements of (C) including an inability to ambulate effectively. (Doc. 13, at 15) (citing Tr. 440, 475). However, the Court need

not reach an analysis of Listing 1.04(C) because Plaintiff has presented evidence showing a possibility he meets Listing 1.04(A). *Foster*, 279 F.3d at 354.

Pursuant to Listing 1.04(A), Plaintiff points to evidence of herniated nucleus pulposus and stenosis of the lumbar spine (Tr. 288, 338), resulting in some evidence of nerve root compression (citing Tr. 288, 338, 361, 475), as required by the initial criteria, as well as pain (citing Tr. 288, 293, 364, 437, 493), muscle weakness (citing Tr. 543), loss in sense and reflexes (citing Tr. 351), and positive straight leg raise tests (citing Tr. 351, 355, 372) (Doc. 13, at 15). *See* 20 C.F.R. 404, Subpt. P., App. 1, § 1.04(A).

Thus, the case must be remanded for consideration and explanation of whether Plaintiff's impairment satisfies the remaining criteria of the Listing. This error is not harmless because if Plaintiff meets the requirements for the listing he will be found disabled. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 ("The ALJ's error was not harmless, for the regulations indicate that if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits; no more analysis is necessary.") (citing 20 C.F.R. § 404.1520(a)(4)(iii)); *see also Risner v. Comm'r of Soc. Sec.*, 2012 WL 893882, at *5 (S.D. Ohio) ("The ALJ should, in the first analysis, assess whether the evidence put forth shows that Plaintiff meets or equals a Listing. Should he determine [he] does not, the ALJ must explain his decision with a discussion and analysis of the evidence.").

Therefore, the Court finds remand is required for further consideration of whether Plaintiff's impairments meet the requirements of Listing 1.04. "While the Commissioner may ultimately be correct that [Plaintiff] does not suffer from a listing level impairment, this Court cannot make such a determination without an appropriate Step Three analysis." *Brown v. Comm'r*, 2013 WL 3873230, at *7 (N.D. Ohio).

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying benefits is not supported by substantial evidence. Accordingly, the decision of the Commissioner is reversed and this case is remanded for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge